IN

# THE SUPREME COURT

OF

# THE STATE OF LOUISIANA.

### EASTERN DISTRICT.
## NEW-ORLEANS, JUNE TERM, 1841.

## AGRICULTURAL BANK OF MISSISSIPPI *vs.* BARQUE JANE—GREGORY BYRNE, Owner.

### APPEAL FROM THE COMMERCIAL COURT OF NEW ORLEANS.

The freighters of a vessel under charter party have no claim on the owner for damages alleged to have been occasioned by the accidents, &c., of the voyage. There is no privity between the freighters who contract with the charterer, and the owner.

The payment of privileged claims against a vessel, does not subrogate the persons paying, as privileged creditors, when there is no conventional subrogation.

The master of a vessel even under charter party, is bound to consult the owner in the home port, when necessary or extensive repairs are to be made.

When there is no privity of contract between plaintiff and defendant, the latter cannot be put in delay.

EASTERN DIS.
June, 1841.

AGRICULTURAL BANK OF MISSISSIPPI *vs.* BARQUE JANE, GREGORY BYRNE, OWNER.

EASTERN DIS.
June, 1841.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

Proposals for a compromise or conversations about it, are not generally admissible in evidence; but if any fact or distinct liability is admitted, evidence of it may be given; allowing the party the benefit of *all the* conversations or propositions which took place.

The plaintiffs sue as the freighters of the Barque Jane, belonging to the defendant, to recover a large sum which they allege they have laid out and expended on said vessel, after shipping on board of her 1100 bales of cotton, in consequence of her unseaworthiness at the time of shipment. They further show that the defendant had chartered said vessel on the 4th December, 1837, to one N. S. Smith, to proceed on a voyage from the port of New-Orleans or Natchez, to Liverpool, or a port in France, and back again; and that he guarantied to make her sea-worthy and ready for sea. That Smith took command and brought said vessel to Natchez, where they freighted her with cotton, and that on going to sea, she proved wholly unseaworthy; so much so that she was compelled to put back, discharge her cargo and undergo extensive repairs at their cost; and on refitting, proceeded on the voyage under a new captain. They allege that the defendant and vessel are liable for all the repairs and expenses in the refitting and reshipment, on his guaranty. That they are subrogated to the rights of N. S. Smith under his charter party by operation of law and the agreement therein so as to make the guaranty of said defendant enure to their benefit. They pray judgment for $12,401 65, with a privilege on the vessel for the sum of $6,917 39.

The defendant pleaded first the general issue, and set up special matters in defence. He also reconvened in the sum of $1,567 44, for balance due on the charter party.

The pleadings, issues, facts and evidence of the whole case are so fully set forth in the written opinion of this court, that they need not be recapitulated.

The cause was submitted to a jury, on the pleadings and evidence adduced, under a charge from the judge. The jury were instructed that there was an implied contract that every vessel employed or chartered to carry freight, was sea-worthy;

and if she was not, that the owner is liable for any damage arising in consequence thereof, &c.

EASTERN DIS. June, 1841.

AGRICULTURAL BANK OF MISSISSIPPI vs. BARQUE JANE, GREGORY BYRNE, OWNER.

The main inquiry was, then, as to the sea-worthiness of the vessel? The plaintiffs proved they had made extensive repairs, in consequence of which the vessel was better and of more value than at first.

When the cause was about to go to the jury, the plaintiffs dismissed so much of their action as claims for average; and continue it only for the amount of repairs, the ship's contribution to general average and insurance on the vessel, amounting to $6,917 39. There was a verdict and judgment in favor of the plaintiffs for $5,349. The defendant appealed.

*Lockett & Micou,* for the plaintiffs.

*Grymes,* for the defendant.

*Garland, J.* delivered the opinion of the court.

The plaintiffs allege that the Barque Jane was, in December, 1837, chartered by her owner, Byrne, to N. S. Smith, for a voyage from Natchez or New-Orleans to Liverpool, or a port in France, and back again. That the Barque was warranted to be made sea-worthy, to stand A. 3 at the insurance offices, and in the charter party it is agreed, the price shall be four thousand four hundred dollars, $2,832 56, paid in cash, and the remainder at the expiration of the voyage. Smith was to pay all the port charges, the victualling and manning of the ship, and all and every expense attendant upon the voyage, which shall not amount to a case of average. He received the vessel in New-Orleans, went to Natchez, where he took on freight for plaintiffs upwards of eleven hundred bales of cotton, and the vessel departed on her voyage to Liverpool. It is alleged that soon after leaving the mouth of the Mississippi, without any disaster, accident or recent apparent cause, the vessel sprung a-leak and was compelled to return to New-Orleans for repairs and prevent a total loss, where a survey was

EASTERN DIS.
June, 1841.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

had by the port wardens and other legal officers, when the cargo was ordered to be discharged, the vessel pronounced unseaworthy, but capable of being repaired, so as to complete the voyage. That Smith being unable to repair the vessel, placed her under the control of the plaintiffs on condition, that they should loan and advance to the said captain and charterer the sums necessary for said voyage, that in pursuance of this agreement, the plaintiffs lent and advanced said Smith money to pay the wages of the captain and crew, for supplies, labor, repairs, armament and equipment of the vessel, premiums of insurance, damage done to freighters, and such other expenses and repairs as the owners were liable to pay in the nature of a partial average. It is further alleged, that in pursuance of this agreement, the plaintiffs appointed another captain to command the vessel, fitted her out and sent her to her port of destination, thereby enabling her to earn her freight. They further say the vessel remained pledged during the continuance of the voyage, and that their advances amount to $6,917 37. It is also alleged that when the vessel first went to sea she was not sea-worthy, wherefore the plaintiffs say, Byrne has violated his warranty and thereby became personally liable for the amount claimed. There is also an allegation of being subrogated to the rights of Smith by operation of law and the agreement aforesaid, so far as to make the warranty of the defendant enure to the plaintiffs' benefit. The Barque was sequestered and a judgment prayed for, condemning her to be sold.

The defendant denied plaintiffs' right to sue, and craved oyer of their charter. After a general denial he specially answered:

1. That supposing the plaintiffs' statements to be true, yet he is in no manner bound to them as he has never contracted with them.

2. The plaintiffs have no lien on the Barque.

3. They have no right of action as the money said to have been advanced was not on his (defendant's) account, or at his

request, but for the sole use and benefit of the plaintiffs or some other person with whom they had contracted.

4. That at the time of the alleged advances, the Barque was not in the possession of defendant, but in possession of Smith, the charterer, who was for the voyage the owner and possessor thereof, and is alone responsible.

5. That the money alleged to have been advanced, was disbursed not for his use but against his express consent, he being at all times ready and willing to comply with his charter party, according to law and mercantile usage.

The defendant further pleads in re-convention the sum of $1,567 44, the balance due on the charter party.

The evidence shows the Barque left Natchez and reached New-Orleans in February, 1838, which port she left on the 19th of the same month, when, as Smith the master, and the mate, say in their protest, made on oath, "that at the time of sailing, the said Barque was tight and staunch, well manned and provided." They proceed to say they were towed to the mouth of the river; the next day in endeavoring to get out, the steamer ran aground in the South-West Pass, and the ship ran foul of her, "which carried away the shank of the anchor, drove the flukes through the sheathing and the stock into the bows about a foot," the vessel also grounded, but soon got off. She was taken to the pilots' establishment, a survey was had, the damages repaired, and she again put to sea, the pumps having been frequently used, and the vessel making no unusual quantity of water. They left the Mississippi the second time, on the 27th of February, when there was no leak; in going out she again grounded on the bar, and was taken off by a steamer. On the night of the 1st of March, the weather becoming quite severe and the sea rough, the Barque commenced leaking. The gale increased during the night, and the vessel leaked so much, as to compel the master to put back, the crew refusing to do duty, unless he did so. The vessel returned to the passes, discharged a part of the cargo to lighten her over the bar, and was towed to the city, where she

EASTERN DIS.
June, 1841.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

EASTERN DIS.
June, 1841.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

was examined, and pronounced by most of the witnesses un-sea-worthy, although there is one who says he supposes the vessel sea-worthy in the month of December, 1837, and was so, at the time of sailing. On the 15th of March, the charterer and master made a note of protest before a notary, commenced discharging the cargo, and a few days after wrote a letter to Messrs. J. H. Leverich & Co., informing them of his having returned from sea in distress, his having seen the agent of the consignees in Liverpool, that it was necessary to discharge the cargo to have a survey, and he concludes by saying he has the consent of that agent to appoint Leverich & Co. agent for himself and all concerned.

There is no evidence to show that on the return of the vessel to New-Orleans where the defendant resides, he was informed of it, nor was he called upon to attend the survey or repair the vessel. Smith in his protest, says, whilst at the South-West Pass, he received two messages from the defendant, one of which was to act as he thought proper, and the other stating he had nothing to do with the Barque, but requesting the master to proceed as he thought best. Whether the master had sent him any message does not appear. Not a single witness speaks of any demand being made on the defendant to repair the vessel, although he is a ship-builder, and has an extensive establishment for the purpose of building and repairing vessels, nor was he called on to furnish another vessel to take the cargo from the Jane.

Mr. Leverich testifies, that after the Barque returned in distress, Smith insisted upon taking a part of the cargo to pay for the repairs, he would not give up the cotton, and it was only allowed to go under the control of witness upon condition of his paying for all the repairs of the vessel, the defendant having the privilege of appointing another captain in case the insurance offices should refuse to take risks upon the cargo on account of the captain, which it appears they did, and a new captain was appointed, the vessel and cargo consigned to witness's friends in Liverpool, and to his own house on her

homeward voyage. The new consignees in Liverpool re-
ceived the freight on the outward cargo and the witness on that
inward. It further appears from the testimony of this witness,
that in consequence of an increase in the rate of freight from
the time the Barque sailed from Natchez to the time of her
return in distress, it would have cost the plaintiffs five or six
thousand dollars more to have shipped their cotton by another
vessel.

It further appears, that Smith continued to superintend the
repairs of the vessel up to the time of her final departure, as
nearly all the accounts paid by Leverich are approved by him,
he was in the same city with the defendant more than three
months, and never said a word to him about repairing the
vessel or paying the expenses, nor do the plaintiffs appear to
have called on him until long after the vessel had sailed, and
finally, it appears, that about two months and a half after the
vessel had returned, had been condemned as unseaworthy,
was supposed to have been so for months previous, and was
then undergoing repairs. Smith, the charterer and master, and
his mate, by a notarial protest on oath, say, the excessive
violence of the elements as before recited, was the cause of all
the loss and damage sustained by the Barque, and this protest
is offered in evidence by the plaintiffs themselves, and they,
by repeatedly endeavoring to effect an insurance on the cargo,
seemed willing to guaranty the sea-worthiness of the vessel,
and did at last warrant it, by obtaining an insurance and
receiving indemnity for the loss sustained by the leaking of the
Barque.

The plaintiffs base their hopes of recovery on several
grounds.

First: The vessel was unseaworthy when the cargo was
taken on board, and she first sailed; that Byrne had war-
ranted her to be sea-worthy, and that she should stand A. 3, at
the insurance offices. The counsel have read us various au-
thorities to prove it is an indispensable obligation of every
owner when he offers a vessel for freight or charter to furnish

EASTERN DIS.
June, 1841.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

one that is staunch and tight. This is no doubt true, and Smith, to whom the Jane was chartered, in his protest made in May, 1838, uses the words of the law in which he is sustained by the mate. This declaration was made after both of them had a full opportunity of examining the vessel.

We are unable to see the grounds of the plaintiffs' claim to the benefit of the warranty made in favor of Smith. That we suppose, is as much personal to him as any other contract, and as there is no privity between the plaintiffs and the defendant and they have no assignment of his (Smith's,) rights, we do not think they can recover on that ground. Smith engaged to furnish plaintiffs a good ship, and he is the person responsible for a failure to do so. When they call on him for damages for a breach of his contract, it is possible he may have a right to call the defendant to defend him, but until then, the plaintiffs have no right to assume Smith's rights and use them for their benefit.

*The freighters of a vessel under charter party have no claim on the owner for damages alleged to have been occasioned by the accidents, &c., of the voyage. There is no privity between the freighters who contract with the charterer, and the owner.*

The letter to Leverich & Co. from Smith, is no assignment of those rights, but only constitutes that firm the agents of himself and all concerned, without mentioning the names or interests of the plaintiffs or the defendant, and when he was finally compelled to give up the command of the vessel, he does not seem to have abandoned his right to receive the freight on the outward and inward cargoes, or any other to which he was entitled.

They next say, they are subrogated to the rights of Smith. It is not pretended there is a conventional subrogation; it must therefore be legal, if there be any.

We have examined the provisions of our law that regulate legal subrogations and cannot find any that will cover this case. The plaintiffs do not come within any of the clauses of the art. 2157 of the Code, or any adjudged case; and the counsel has not referred us to any principle in the maritime law, which supports his position. If the counsel means that his clients are subrogated to the claims of the ship-carpenters

and other workmen and the vendors of supplies and materials, we think he is equally unfortunate. Those persons very probably had privileges for their labor, supplies and materials, but when the agents of the plaintiffs paid them, they took no conventional subrogation of their rights and they do not stand in a position to have them transferred by operation of law.

, The third ground taken by the plaintiffs is, that as the vessel was in the possession of Smith, he had a right to have her repaired and was not bound to call on the owner. If Smith had have been the master employed by the owner and not in the home port this would probably be true. The master of a vessel in a distant or foreign port, has the power to raise money to make necessary repairs and purchase supplies, and for that purpose, may bind the owner personally or hypothecate the vessel. This is a well established principle of maratime law and is founded upon another well known principle that the master is the agent of the owner and has sometimes to act under circumstances that will not allow of such delay that he may be consulted. But when in a port not so distant as that injury will result from a short delay, a prudent master will, and ought always to consult with his owner, before contracting to have expensive repairs made on a vessel at his cost, and when in the home port, we think he is bound to notify and consult him. The character of the agency of the master is much restricted when in the same place with his employer, and it would be allowing an agent an almost unlimited control over the property of his principal, if he could at his will and pleasure incur large or extravagant expenditures without consultation or notice.

But this case is not as strong as that of an ordinary master either in the home or a distant port. Smith was the charterer of the barque, and there is no evidence to show that Byrne knew he was to be the master, and it would be going very far to say that one party to a charter-party by taking on himself the quality of master, can bind the other to an indefinite extent, without his consent. We are not prepared to sanction such

*Eastern Dis.*
*June, 1841.*

AGRICULTURAL
BANK OF
MISSISSIPPI
*vs.*
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

The payment of privileged claims against a vessel, does not subrogate the persons paying, as privileged creditors, when there is no conventional subrogation.

The master of a vessel even under charter party, is bound to consult the owner in the home port, when necessary or extensive repairs are to be made.

EASTERN DIS. an application of a well understood and necessary rule. We
June, 1841.
think the master of a vessel ought on all convenient occasions
AGRICULTURAL to inform and consult with his owner, when any extraordinary
BANK OF
MISSISSIPPI expenses are to be incurred, or any deviation from the ordinary
vs.
BARQUE JANE, rules of business is about to be made. There is no evidence ·
GREGORY
BYRNE, of any such ratification or consultation in this case, and we
OWNER. think this ground is not more tenable than the others.

It has been strongly urged by the defendant's counsel that
the plaintiff cannot recover in this case, because the defendant
has not been put legally in default according to the article 1905
of the Code. If this suit had have been brought by Smith for
damages for a breach of the contract, or to coerce a specific
When there is performance, it is very probable it would have been necessary
no privity of to put the party in default, and if we held the plaintiffs were
contract be-
tween plaintiff the assignees of Smith, they would come under the same obli-
and defendant,
the latter cannot gation. But as there is no contract between plaintiffs and
be put in delay. defendant he cannot be put in delay.

Upon a full examination of all the circumstances of this case,
we do not see but one ground upon which the plaintiffs can hope
to recover, and that is, as Byrne was residing very near to the
place where the vessel was repaired, he is presumed to know
what was doing to her, and as he did not object to the repairs
being made or offer to do them himself, he ought to pay for
them. This rests upon the equitable principle that one man
ought not to enrich himself at the expense of another. In
considering it, the motive that induced the plaintiffs to under-
take the repairs to the Jane ought to be taken into considera-
tion. The equities on both sides should be weighed. There
is no doubt a considerable sum of money was expended by
plaintiffs on a vessel belonging to defendant, by which her
value was much increased, but the evidence leaves it doubtful
whether he knew any thing about it. On the other hand, the
plaintiffs did not act entirely from disinterested motives in
making the expenditures and advances they did. Their own
witness says they profited five or six thousand dollars by the
outlay, in consequence of the increase in the rate of freight.

We do not think the verdict fully sustained by the evidence nor do we think substantial justice has been done between the parties ; we must therefore remand the case for a new trial.

AGRICULTURAL
BANK OF
MISSISSIPPI
vs.
BARQUE JANE,
GREGORY
BYRNE,
OWNER.

The plaintiffs have directed our attention to a bill of exception taken by them to the opinion of the court excluding a letter from defendant addressed to J. H. Leverich, Esq., on the 19th of October, 1838. The ground on which the letter was rejected was, it was a proposal for a compromise, in compliance with a request from Leverich. If the letter contained nothing more than proposals for a compromise we should say the judge did not err in rejecting it, but we think it makes an admission of a fact, to establish which it was proper evidence. It says " I am willing either to sell the ship at a low price or charter her, *so as to pay what I may be indebted to the bank ;* in no case, however, shall I agree to pay all the bills," &c. He also says, he is willing to pay the sum for which he could have repaired the vessel in his own yard, which is about three thousand dollars.

The rule of evidence is, that mere proposals for a compromise or the conversations or negotiations which may take place for the purpose of effecting one, are not generally admissible as evidence, but if in the proposals, conversations or negotiations any fact or distinct liability is admitted, evidence may be given of that, but the party who is attempted to be charged in this manner, is entitled to have the benefit of all the conversation or proposal, and the whole should be considered by the court and jury ; 2 Starkie, 38 ; 2 Martin's Rep., 175 ; 4 Pickering, 377. If a claim be set up against an individual and he say, I do not owe it, but rather than have a *suit or further diffi-*culty I will give or pay a certain sum, this should not be admitted ; but if on the presentation of an account certain items are admitted and others denied, this may be given in evidence ; so if we have a demand against another and in endeavoring to settle it, the person charged admits the indebtedness but denies the extent of it, the whole may be admitted

Proposals for a compromise or conversations about it, are not generally admissible in evidence; but if any fact or distinct liability is admitted, evidence of it may be given; allowing the party the benefit *of all the* conversations or propositions which took place.

EASTERN DIS. as evidence.  We therefore think the judge erred in rejecting
June, 1841. the letter of the defendant.

CROCKER,              The judgment of the Commercial Court is therefore annul-
SYNDIC, &c.,
vs.       led, avoided and reversed, and the case is remanded to that
CHAMPLIN.   court to be proceeded in according to law, with directions not
to reject the letter of the defendant of the 19th of December,
1838, the plaintiffs to pay the costs of this appeal.